UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CELEBRITY CRUISES, INC.,

    Plaintiff,

v.                                 CASE NO.:

TOKIO MARINE SPECIALTY
INSURANCE COMPANY,

    Defendant.
_____/

**PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Celebrity Cruises, Inc. ("Celebrity"), by and through its undersigned counsel, brings this action against Defendant, Tokio Marine Specialty Insurance Company ("Tokio Marine" or the "Insurer"), and in support of this Complaint and Demand for Jury Trial states as follows:

**NATURE OF THE ACTION**

1. This case is about an insurance company that issued two liability policies to comprehensively protect a business that conducts underwater "snuba"[1] excursions, yet now maintains that those policies do not provide any coverage in connection with a catastrophic snuba incident.

2. Nassau Undersea Adventures Ltd. d/b/a Stuart Cove's Dive Bahamas ("Stuart Cove") is a Celebrity shore excursion provider that runs underwater snuba excursions for cruise guests. Intent on protecting itself, its business partners, and its guests in the event of an accident, Stuart Cove obtained the very types of insurance that any responsible business would be expected

---

[1] The word "snuba" is a portmanteau of "snorkel" and "scuba" because it is a hybrid of the two forms of diving.

to have for this type of operation. Specifically, Stuart Cove purchased *two* different liability insurance policies from Tokio Marine to provide comprehensive coverage for its business: (1) a professional liability policy, and (2) a commercial general liability policy. Celebrity was also insured under these policies as an "additional insured."

3. On or about April 5, 2019, Celebrity passenger Jeffrey Case tragically died during a Stuart Cove snuba excursion after allegedly experiencing difficulty with his equipment in rough waters.

4. Mr. Case's widow subsequently filed a lawsuit against Celebrity and Stuart Cove, and both of the insureds tendered the action for coverage under Tokio Marine's professional liability and commercial general liability policies.

5. Together, these policies provide comprehensive liability coverage for all facets of Stuart Cove's business operations ranging from the moment a guest steps foot onto its property all the way through the time spent underwater. While this dictates that coverage must be available under *at least* one of the policies, this did not stop Tokio Marine from attempting to avoid coverage at all costs.

6. Well aware of the business risks it agreed to insure and the contractual obligations it agreed to undertake, Tokio Marine inexplicably denied coverage under *both* policies with a coverage position tantamount to "heads I win, tails you lose." In self-serving fashion, the Insurer cited one policy exclusion under the professional liability policy and another under the commercial general liability policy – neither of which makes any reference to snuba – and maintained that these provisions barred coverage for the alleged wrongful death.

7. As if Tokio Marine did not specifically write these policies to cover the risks associated with Stuart Cove's business, the Insurer outright denied coverage, abandoned Stuart

Cove and Celebrity, and refused to provide any defense to the wrongful death suit. Celebrity's subsequent efforts to convince the Insurer to change course were largely ignored and proved unsuccessful.

8.     With no choice but to conduct itself as a reasonable uninsured, Celebrity defended itself in the wrongful death suit and ultimately negotiated a settlement with the plaintiff (as it was entitled to do under Florida law). Notwithstanding Tokio Marine's prior refusals to amend its coverage position, Celebrity provided the Insurer another opportunity to acknowledge its coverage obligations by reimbursing Celebrity for its defense costs and the final settlement amount. Tokio Marine again refused.

9.     Celebrity is entitled to reimbursement of these amounts under the subject policies and now brings this breach of contract action to enforce the clear obligations that Tokio Marine agreed to undertake when it gladly accepted a premium to insure Stuart Cove's business operations.

**PARTIES**

10.    Plaintiff, Celebrity Cruises, Inc., is a Liberian corporation with its principal place of business at 1050 Caribbean Way, Miami, Florida 33132. Celebrity is an additional insured under the professional liability and commercial general liability insurance policies issued by Tokio Marine to Stuart Cove.

11.    Defendant, Tokio Marine Specialty Insurance Company, is a Delaware corporation with its principal place of business in Bala Cynwyd, Pennsylvania. Tokio Marine is authorized to sell insurance in the state of Florida and, on information and belief, is actively engaged in the business of selling insurance in Broward County, Miami-Dade County, and throughout the state of Florida. Tokio Marine issued the subject professional liability and commercial general liability

insurance policies to Stuart Cove at Stuart Cove's principal address in Davie, Florida, and agreed to insure Celebrity as an "additional insured" at Celebrity's principal address in Miami, Florida.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds $75,000 exclusive of interest and costs, and complete diversity of citizenship exists.

13. This Court has personal jurisdiction over Tokio Marine because it: (1) is an authorized insurer in the state of Florida, (2) generally transacts business throughout the state of Florida, and (3) issued two insurance policies to Stuart Cove in this judicial district and agreed to insure Stuart Cove and Celebrity, both of which maintain their principal places of business in this judicial district. In addition, Tokio Marine contractually agreed in the insurance policies to submit to personal jurisdiction in any court within the United States.

14. Venue is properly placed under 28 U.S.C. § 1391, as this is a diversity action in which a substantial part of the events or omissions giving rise to the claims and losses occurred in this judicial district.

## FACTUAL BACKGROUND

### The Underlying Lawsuit

15. On May 1, 2020, Alison Case (the "Plaintiff"), individually and on behalf of her deceased husband, Jeffrey Case ("Mr. Case" and, collectively, the "Cases"), commenced a lawsuit against Celebrity and Stuart Cove in the United States District Court of the Southern District of Florida, Case No. 1:20-cv-21826-KMW (the "Underlying Lawsuit").

16. The operative Second Amended Complaint (the "SAC"), attached hereto as **Exhibit "A,"** was filed on August 31, 2020.[2]

17. As alleged in the Underlying Lawsuit, the Cases were guests on a Celebrity cruise in April 2019 who purchased a "snuba" excursion run by Stuart Cove.

18. Snuba is a form of surface-supplied diving that uses an underwater breathing system.

19. Instead of coming from tanks strapped to the diver's back (as in scuba diving), air is supplied from long hoses connected to compressed air cylinders contained in a specially designed flotation device at the surface.

20. In short, the diver breathes through a regulator that is connected by a hose to his or her air supply, which floats on a raft at the surface.

21. While snuba diving, Mr. Case was using his flotation device to remain above water. SAC at ¶ 46.

22. On the date in question, there was allegedly extremely rough waters and the type of equipment provided made it difficult to swim. SAC at ¶ 47.

23. Allegedly, Mr. Case's weight belt kept coming loose, the lines were getting tangled, and he was constantly losing the mouthpiece for the respirator. SAC at ¶ 47, 48.

24. At some point Mr. Case went underwater and other passengers came to rescue him by bringing him aboard Stuart Cove's dive boat. SAC at ¶¶ 51-54.

---

[2] As discussed below, Celebrity settled the Underlying Lawsuit with the Plaintiff while the SAC was operative. The Underlying Lawsuit has since been dismissed with prejudice. Celebrity cites the SAC's allegations herein for the sole purpose of determining Tokio Marine's contractual obligations and does not admit the truth of those allegations.

25. The SAC alleged that none of Stuart Cove's employees had any experience with or knowledge of CPR, and that there was no automatic defibrillator on the boat. SAC at ¶ 56.

26. Further, the Plaintiff alleged that despite urging Stuart Cove to immediately take Mr. Case for emergency care or otherwise obtain emergency treatment, the employees significantly delayed getting Mr. Case back to land. SAC at ¶ 57.

27. Allegedly, it was approximately 45 minutes to an hour before Mr. Case was taken back to land for medical treatment, at which time resuscitation efforts were unsuccessful and Mr. Case was pronounced dead. SAC at ¶ 58.

28. As a result of Mr. Case's alleged wrongful death, the SAC asserted four counts against Celebrity for Negligence, Negligent Infliction of Emotional Distress, Negligent Misrepresentation, and Liability Based on Apparent Agency. The SAC also asserted a count against Stuart Cove for Negligence.

29. After the Plaintiff commenced the Underlying Lawsuit, Stuart Cove and Celebrity both tendered the action to Tokio Marine and requested that the Insurer provide a defense and indemnity under two different insurance policies: (1) a professional liability policy, and (2) a commercial general liability policy.

30. On July 10, 2020, Tokio Marine responded with an outright coverage denial and maintained that it had no duty to provide a defense or indemnity under either of its insurance policies.

**The Professional Liability Policy and Tokio Marine's Wrongful Coverage Denial**

31. Tokio Marine issued Stuart Cove a claims made professional liability policy, Policy No. PPK1992899, with a Policy Period from June 30, 2019 through June 30, 2020 (the "Professional Liability Policy," attached as **Exhibit "B"**).

32. Celebrity is also insured under the Professional Liability Policy pursuant to the Additional Insured – Blanket Form Endorsement. That endorsement provides, in relevant part: [E]ntities are added as an additional insured if named on a certificate of insurance issued to an insured. Prof. Liability Pol., Additional Insured End., Section 2. The Group Professional Certificate of Insurance that specifically lists Celebrity as an additional insured is attached as **Exhibit "C."**

33. The operative insuring agreement in the Professional Liability Policy provides, in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of any Occurrence that is a result of any negligent act, error, or omission in the rendering or failure to render Professional Services of the type described in Item 5 of the Declarations, whether committed by the Insured or by any person for those negligent acts, errors or omissions the insured is legally responsible . . . We will have the right and duty to defend any Suit seeking those damages . . .

Prof. Liability Pol., § I(1)(A).[3]

34. An Occurrence is defined as "an accident neither expected nor intended by the named insured which occurs while the claimant or decedent is in the water, entering, exiting or preparing to enter the water **in connection with SCUBA, snorkeling, swimming or freediving activities**. It also includes an accident occurring in a pool or natural body of water and/or classroom, and or [sic] an accident which occurs **while the claimant or decedent is receiving emergency first aid or swimming instruction**." Prof. Liability Pol., Section V (emphasis added).

35. The Professional Services identified in Item 5 of the policy include "**Scuba Diving; Snorkeling, Swimming and Freediving Instruction and Supervision;** Emergency First Aid

---

[3] Capitalized words and phrases are specifically defined by the policies and are intended to have the same meaning when used herein.

Training; [and] Cylinder Instruction/Inspection Services." Prof. Liability Pol., Declarations Item 5 (emphasis added).

36. As is readily apparent, the definitions of Occurrence and Professional Services track the very types of services and experiences offered by Stuart Cove in its dive business.

37. The Underlying Lawsuit alleged that Mr. Case's death involved snuba, a hybrid between "scuba diving" and "snorkeling" – two activities that are expressly listed in the definitions of Occurrence and Professional Services.

38. At a minimum, the Underlying Lawsuit alleged that Mr. Case's death involved "swimming," another activity expressly listed in the definitions of Occurrence and Professional Services.

39. The Underlying Lawsuit also alleged that Mr. Case's death involved "emergency first aid," "swimming instruction," and/or "swimming . . . instruction or supervision" (or the lack thereof), all of which are activities expressly listed in the definitions of Occurrence and Professional Services.

40. Mr. Case's alleged wrongful death is accordingly a covered Occurrence in connection with the rendering or failure to render the express Professional Services for which Stuart Cove and Celebrity are insured under the Professional Liability Policy.

41. Tokio Marine's coverage denial does not dispute that Mr. Case's alleged wrongful death was a covered Occurrence in connection with the very types of Professional Services for which Stuart Cove and Celebrity are insured under the Professional Liability Policy.

42. Under Florida law, an insurer's duty to defend is an extremely broad obligation that requires an insurer to provide a defense to any action in which there exists any possibility that the insured might be held liable for covered damages.

43. Despite the clear applicability of the Professional Liability Policy's insuring agreement, Tokio Marine denied any obligation to defend or indemnify Celebrity based entirely on a single policy exclusion.

44. Policy exclusions are interpreted narrowly under Florida law and, when an insurer relies on an exclusion to deny coverage, it has the burden of demonstrating that the allegations of the complaint are cast *solely and entirely* within the policy exclusion and are subject to no other reasonable interpretation.

45. If the policy language is susceptible of two reasonable interpretations, one providing coverage and the other excluding coverage, the policy is considered ambiguous. Ambiguities are construed in favor of the insured without resort to extrinsic evidence.

46. Here, the operative exclusion cited by Tokio Marine provides, in relevant part:

> This insurance does not apply to . . . [a]ny claim arising out of any Occurrence involving the insured's conduct of an introductory experience program (any program designed to introduce uncertified divers to **recreational scuba diving** via a supervised, controlled open water dive experience) that was not in accordance with Recreational Scuba Training Council (RSTC) standards.

Prof. Liability Pol., § I(2)(II) (emphasis added).

47. The plain language of the exclusion does not apply for the simple reason that snuba is not recreational scuba diving.

48. The exclusion does not give the carrier discretion to deny coverage for anything that it deems "an introductory experience program." Instead, the parenthetical specifically defines what this phrase means: "any program designed to introduce uncertified divers to recreational scuba diving."

49. There is no factual basis for Tokio Marine to maintain that the snuba excursion constituted "recreational scuba diving."

9

50. "Scuba" is an acronym that stands for "Self Contained Underwater Breathing Apparatus" and is a specifically-defined type of diving.

51. Mr. Case was not scuba diving during the Stuart Cove excursion on April 5, 2019.

52. The Underlying Lawsuit does not allege that Mr. Case was scuba diving during the Stuart Cove excursion on April 5, 2019.

53. At a minimum, the exclusion is ambiguous because it lacks any reference to snuba diving. If Tokio Marine meant to exclude snuba through this endorsement, it could have (1) specifically referenced these activities, or (2) used broader language that encompassed other forms of diving. It declined to do so.

54. If Tokio Marine intended to exclude snuba diving from coverage, it was incumbent on the insurer to do so clearly and unambiguously. This is especially true considering that Stuart Cove *specifically* purchased this policy to cover its underwater services and experiences.

55. The Underlying Lawsuit implicates the Professional Liability Policy's insuring agreement and the cited exclusion is facially inapposite based on its plain language.

56. Accordingly, Tokio Marine minimally had a duty to defend Celebrity in the Underlying Lawsuit.

57. Further, because there are no other applicable exclusions or policy defenses, Tokio Marine also had a duty to indemnify Celebrity under the Professional Liability Policy for any and all damages in connection with the Underlying Lawsuit, including any settlement.

## The Commercial General Liability Policy and Tokio Marine's Wrongful Coverage Denial

58. At all relevant times, Stuart Cove was also insured under a commercial general liability policy issued by Tokio Marine (the "CGL Policy").[4]

59. Celebrity is also insured under the CGL Policy pursuant to an Additional Insured Endorsement. That endorsement provides, in relevant part: "Section II – Who Is An Insured is amended to include any person or organization you are required to include as an additional insured on this policy by a written contract or written agreement in effect during this policy period and executed prior to the Occurrence of the Bodily Injury or Property Damage . . ." CGL Pol., Additional Insured End. Stuart Cove was required to include Celebrity as an additional insured on this policy pursuant to an executed Tour Operator Agreement with an effective period from January 1, 2019 through December 31, 2020. Celebrity is accordingly an additional insured under the CGL Policy.

60. The operative insuring agreement in the CGL Policy provides, in relevant part:

(a) We will pay those sums that the insured becomes legally obligated to pay as damages because of Bodily Injury or Property Damage to which this insurance applies. We will have the right and duty to defend the insured against any Suit seeking those damages...

(b) The insurance applies to Bodily Injury and Property Damage only if . . . (1) [t]he Bodily Injury or Property Damage is caused by an Occurrence that takes

---

[4] As alleged herein, the applicable CGL Policy is the one in effect when the bodily injury occurred (here, April 5, 2019). Tokio Marine, however, issued its coverage denial under Policy No. PPK 1992907, which has a Policy Period of June 30, 2019 to June 30, 2020 (attached as **Exhibit "D"**). This was a renewal of Policy No. PPK1830783 which, upon information and belief, covered the preceding year during which the subject bodily injury occurred. When Celebrity made a statutory request for the applicable insurance policies pursuant to Fla. Stat. § 627.4137, Tokio Marine provided a copy of Policy No. PPK 1992907 bearing the Policy Period of June 30, 2019 to June 30, 2020. Celebrity reserves the right to amend its Complaint in the event Tokio Marine provided the incorrect policy.

>       place in the Coverage Territory; [and] (2) [t]he Bodily Injury or Property
>       Damage occurs during the policy period[.]

CGL Pol., § I(A)(1)(a), (b).

61. Bodily Injury is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." CGL Policy, Commercial General Liability Coverage Form, Section IV.

62. An Occurrence is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." CGL Policy, Commercial General Liability Coverage Form, Section IV.

63. The Coverage Territory is defined as "[a]nywhere in the world with the exception of any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America…" CGL Policy, Worldwide Coverage Territory Endorsement.

64. As is apparent, Bodily Injury and Occurrence are broadly defined to provide comprehensive coverage for any type of injury, sickness, disease, or death resulting from an accident (hence the title Commercial *General* Liability).

65. The Underlying Lawsuit alleged that Mr. Case died as a result of an accident while he was snuba diving in Nassau, Bahamas.

66. Mr. Case's alleged wrongful death is accordingly a covered Occurrence within the Coverage Territory resulting in Bodily Injury for which Stuart Cove and Celebrity are insured under the CGL Policy.

67. Tokio Marine's coverage denial does not dispute that Mr. Case's alleged wrongful death is a covered Occurrence within the Coverage Territory resulting in Bodily Injury for which Stuart Cove and Celebrity are insured under the CGL Policy.

68. Under Florida law, an insurer's duty to defend is an extremely broad obligation that requires an insurer to provide a defense to any action in which there exists any possibility that the insured might be held liable for covered damages.

69. Despite the clear applicability of the CGL Policy's insuring agreement, Tokio Marine denied any obligation to defend or indemnify Celebrity based entirely on a single policy exclusion.

70. Policy exclusions are interpreted narrowly under Florida law and, when an insurer relies on an exclusion to deny coverage, it has the burden of demonstrating that the allegations of the complaint are cast *solely and entirely* within the policy exclusion and are subject to no other reasonable interpretation.

71. If the policy language is susceptible of two reasonable interpretations, one providing coverage and the other excluding coverage, the policy is considered ambiguous. Ambiguities are construed in favor of the insured without resort to extrinsic evidence.

72. Here, the operative exclusion cited by Tokio Marine provides, in relevant part:

> Designated Service: Supervision and/or instruction of snorkeling, scuba diving, free diving and swimming including but not limited to lifeguard services
>
> This insurance does not apply to any loss, cost, damage, expense, injury, claim or Suit caused by, arising out of, or resulting directly or indirectly, in whole or in part from the rendering of or the failure to render the designated service shown in the Schedule by or on behalf of the insured . . .

73. This exclusion is inapplicable in the first instance because snuba does not appear in the list of "Designated Service[s]."

74. Alternatively, even if snuba is somehow subsumed within the list of "Designated Service[s]," the exclusion cannot apply because the SAC's allegations are not cast solely and entirely within exclusion.

75. As alleged in the Underlying Lawsuit, the death at issue was not simply the result of a snuba incident. Rather, the complaint indicts Stuart Cove's conduct (or lack thereof) *after* Mr. Case was pulled from the water. Specifically, it alleges that:

   a. None of Stuart Cove's employees had any experience with or knowledge of CPR (SAC at ¶ 56);

   b. There was no automatic defibrillator on the boat (SAC at ¶ 56);

   c. Stuart Cove failed to immediately take Mr. Case back to land for emergency care (SAC at ¶ 57); and

   d. Stuart Cove waited approximately 45 minutes to an hour before taking Mr. Case back to land for medical treatment (SAC at ¶ 58).

76. All of these allegations – entirely separate and apart from what transpired in the water – allegedly contributed to Mr. Case's death.

77. At a minimum, the exclusion is ambiguous because it lacks any reference to snuba diving. If Tokio Marine meant to exclude snuba through this endorsement, it could have (1) specifically referenced these activities, or (2) used broader language that encompassed other forms of diving. It declined to do so.

78. The Underlying Lawsuit implicates the CGL Policy's insuring agreement and the cited exclusion is facially inapposite based on its plain language.

79. Accordingly, Tokio Marine minimally had a duty to defend Celebrity in the Underlying Lawsuit.

80. Further, because there are no other applicable exclusions or policy defenses, Tokio Marine also had a duty to indemnify Celebrity under the CGL Policy for any and all damages in connection with the Underlying Lawsuit, including any settlement.

## Tokio Marine's Refusal to Acknowledge its Contractual Duties to Defend and Indemnify Celebrity

81. On January 8, 2021, Celebrity responded to Tokio Marine's coverage denial with a detailed correspondence addressing the available coverage under the Professional Liability Policy and the CGL Policy and the Insurer's misapplication of the policy language and Florida law.

82. Celebrity attached to its correspondence two Civil Remedy Notices of Insurer Violation ("CRNs"), which were filed with and accepted by the Florida Department of Financial Services on January 8, 2021.

83. Those CRNs – which are utilized to perfect an insured's right to later assert a statutory bad faith claim against an insurer under Fla. Stat. § 624.155 – detailed the numerous ways in which Tokio Marine's coverage denials violated Florida law and an insurer's statutory duties of good faith and fair dealing. Copies of the CRNs are attached as **Exhibit "E."**[5]

84. Notwithstanding Tokio Marine's conduct to date, Celebrity advised that the Insurer could cure the statutory violations cited in the CRNs by: (1) acknowledging its duty to defend Celebrity in the Underlying Lawsuit, (2) reimbursing Celebrity for the reasonable time and expense incurred in defending the Underlying Lawsuit since inception, (3) attending the January 12, 2021 mediation that had been scheduled in the Underlying Lawsuit and funding a settlement within limits on Celebrity's behalf, and (4) reimbursing Celebrity for its insurance coverage counsel's fees and costs to address the coverage denial.

---

[5] While Celebrity does not assert a count for statutory bad faith herein, it reserves the right to amend the Complaint upon establishing that Tokio Marine breached any contractual obligation under either or both policies.

85. Despite Celebrity's invitation to work cooperatively at mediation to secure a resolution, the insurer remained silent and mediation occurred with respect to the Underlying Lawsuit without a word from Tokio Marine.

86. Following the underlying mediation, Plaintiff's counsel sent a written demand offering to resolve the Underlying Lawsuit against both of Tokio Marine's insureds for an amount well within the limits of both the Professional Liability and CGL Policies. The offer would be held open until 5:00 on February 2, 2021.

87. Celebrity accordingly wrote to Tokio Marine on January 14, 2021 and demanded that the Insurer resolve this case by accepting the settlement demand and tendering the policy proceeds to the Plaintiff on Celebrity's behalf.

88. Despite numerous follow-up emails and phone calls from Celebrity leading up to the deadline, Tokio Marine all but ignored Celebrity. Approximately twenty minutes before the settlement demand was set to expire, the Insurer's adjuster called Celebrity's counsel to communicate that Tokio Marine was only willing to contribute $20,000 toward a global resolution. The Insurer had once again refused to protect its insureds or acknowledge its contractual obligations.

89. When a resolution was not achieved by the deadline, Celebrity continued to conduct itself as a reasonable uninsured (as it was entitled to do in light of Tokio Marine's coverage denial) and undertook further negotiations directly with Plaintiff's counsel. As a product of those efforts, Celebrity managed to secure a settlement in exchange for a payment to the Plaintiff (the "Settlement Amount").

90. Celebrity accordingly wrote to Tokio Marine on March 22, 2021 to provide the Insurer a final opportunity to honor its contractual obligations and avoid the need for litigation.

To make itself whole, Celebrity requested reimbursement for (1) the Settlement Amount, (2) its defense costs in connection with the Underlying Lawsuit, and (3) its insurance coverage counsel's fees and costs to address the wrongful coverage denials.

91. Tokio Marine responded that it would not amend its coverage positions and offered nothing to resolve the dispute.

92. Despite doubling down on its original coverage determinations, Tokio Marine's public record responses to Celebrity's CRNs effectively admitted that coverage *must* be available under one of the two policies at issue.[6]

93. One the one hand, Tokio Marine claimed that coverage was unavailable under the Professional Liability Policy because snuba is not included in the definition of Professional Services – even though that definition expressly includes scuba diving, snorkeling, swimming and freediving instruction and supervision.

94. On the other hand, Tokio Marine claimed that coverage was unavailable under the CGL Policy by citing a scuba exclusion – which contains absolutely no reference to snuba – and arguing that snuba is excluded because it is "a cross between snorkeling and scuba."

95. These responses confirm that Tokio Marine has done nothing more than adopt opposite positions and interpretations to avoid coverage under both policies.

96. If snuba constitutes a "cross between snorkeling and scuba," the wrongful death at issue indisputably falls within the insuring agreement of the Professional Liability Policy and the cited exclusion under that policy solely addressing scuba does not apply. Alternatively, if snuba is not a "cross between snorkeling and scuba," the wrongful death at issue indisputably falls within

---

[6] Tokio Marine's responses can be found at the conclusion of each CRN contained in **Exhibit "E."**

17

the insuring agreement of the CGL Policy and the cited exclusion that makes no reference to snuba does not apply.

97.   As Tokio Marine's own admissions demonstrate, the Professional Liability and CGL Policies are, at a minimum, complementary to one another and coverage for the Underlying Lawsuit must be available under one or the other.

### Compliance with All Conditions Precedent

98.   Celebrity has satisfied all the applicable terms, conditions, and other requirements of the Policies.  Alternatively, compliance with the applicable terms, conditions, and other requirements in whole or in part has been waived, excused, or is unnecessary for other reasons.

### Retention of Counsel

99.   Celebrity has retained the law firm of Hunton Andrews Kurth LLP to represent Celebrity in this action and has agreed to pay reasonable attorneys' fees, plus all expenses incurred, for its services.

### COUNT I – BREACH OF CONTRACT
### (Professional Liability Policy)

100.   Celebrity re-alleges the preceding paragraphs as if fully set forth herein.

101.   <u>The Contract</u>: At all material times, Celebrity was insured under the Professional Liability Policy, which is a binding, valid, and enforceable contract under Florida law.

102.   The damages in connection with the Underlying Lawsuit, including but not limited to Celebrity's defense costs/expenses and the Settlement Amount, are covered by the Professional Liability Policy.  None of the terms, provisions, conditions, or exclusions in the Professional Liability Policy apply to bar coverage.

103.   <u>Breach</u>: Tokio Marine, through the acts of its agents, representatives, and/or employees, failed to perform its duties and/or obligations under the Professional Liability Policy

18

and thus breached the contract by its acts or omissions as alleged herein, including without limitation, its failure and refusal to acknowledge (1) its duty to defend Celebrity against the Underlying Lawsuit, and (2) its duty to indemnify Celebrity for the Settlement Amount.

104. <u>Damages</u>: As a direct, proximate, and natural result of Tokio Marine's breaches, Celebrity has been deprived of the benefits due under the Professional Liability Policy.

WHEREFORE, Plaintiff Celebrity demands judgment against Defendant, Tokio Marine Specialty Insurance Company, for damages, pre- and post-judgment interest, attorneys' fees pursuant to Fla. Stat. § 627.428, costs, and any further relief this Court deems equitable, just and proper.

## COUNT II – BREACH OF CONTRACT
### (Commercial General Liability Policy)

105. Celebrity re-alleges the preceding paragraphs as if fully set forth herein.

106. <u>The Contract</u>: At all material times, Celebrity was insured under the CGL Policy, which is a binding, valid, and enforceable contract under Florida law.

107. The damages in connection with the Underlying Lawsuit, including but not limited to Celebrity's defense costs/expenses and the Settlement Amount, are covered by the CGL Policy. None of the terms, provisions, conditions, or exclusions in the CGL Policy apply to bar coverage.

108. <u>Breach</u>: Tokio Marine, through the acts of its agents, representatives, and/or employees, failed to perform its duties and/or obligations under the CGL Policy and thus breached the contract by its acts or omissions as alleged herein, including without limitation, its failure and refusal to acknowledge (1) its duty to defend Celebrity against the Underlying Lawsuit, and (2) its duty to indemnify Celebrity for the Settlement Amount.

109. <u>Damages</u>: As a direct, proximate, and natural result of Tokio Marine's breaches, Celebrity has been deprived of the benefits due under the CGL Policy.

WHEREFORE, Plaintiff Celebrity demands judgment against Defendant, Tokio Marine Specialty Insurance Company, for damages, pre- and post-judgment interest, attorneys' fees pursuant to Fla. Stat. § 627.428, costs, and any further relief this Court deems equitable, just and proper.

## JURY DEMAND

Celebrity demands trial by jury.

Dated: June 3, 2021

HUNTON ANDREWS KURTH LLP

/s/ *Walter J. Andrews*
Walter J. Andrews - Trial Counsel
Fla. Bar No. 84863
Cary D. Steklof
Fla. Bar No. 86257
HUNTON ANDREWS KURTH LLP
333 S.E. 2nd Ave., Suite 2400
Miami, Florida 33131
Tel: (305) 810-6407
Facsimile: (305) 810-2460
wandrews@HuntonAK.com
csteklof@HuntonAK.com

*Attorneys for Plaintiff, Celebrity Cruises, Inc.*